IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KENNETH FORTUNE, | : | |
| | : | |
| Plaintiff | : | |
| | : | CIVIL NO. 3:CV-01-0111 |
| vs. | : | |
| | : | (JUDGE VANASKIE) |
| ROBERT S. BITNER, et al., | : | |
| | : | |
| Defendants | : | |

## M E M O R A N D U M

### I.   Introduction

Fortune initiated this action on January 18, 2001, while housed in SCI-Huntingdon's Restrictive Housing Unit ("RHU"), allegedly in violation of an existing separation order that was to segregate him from certain SCI-Huntingdon RHU staff members who purportedly had previously made an attempt on his life.[1]  Fortune asserts that he repeatedly requested defendants Bitner and Bell to transfer him from SCI-Huntingdon due to the prior separation order and his fear that staff intentionally mislabeled him as mentally ill for the purpose of covering up his planned murder by claiming he committed suicide.  Fortune further claims that on December 28, 1999, Defendants Boone, Calderwood, Couch, Gibson, Wyatt,

---

[1]  Plaintiff was transferred from SCI-Huntingdon on May 16, 2001, and is currently incarcerated at SCI-Greene.

Whitesel, Duggan, and Fogel used unreasonable force to remove his jumpsuit and undergarments during a cell extraction.  On that day, Fortune avers, he was ordered to surrender his legal materials and come to the front of his RHU cell to be handcuffed while a security check of his cell was performed.  He claims Defendants then forcibly stripped him, leaving him naked "without the use of life['s] basic necessities, such as bed covering and underclothing for about 5 or 6 days, [and] as a result was freezing and very cold."  He claims Nurse William Williams, who was assigned to the Extraction Team that day, knew he suffered serious medical injuries from this event but failed to provide him any medical treatment.  Fortune's final claim is that he was attacked by Corrections Officers Stevens, Park, Snyder, Mellott and Smith on July 24, 2000, after he "spoke to a prisoner who spoke to him" while he was being escorted to the RHU exercise yard.

On June 14, 2004, Defendants filed a motion for summary judgment, supporting brief, Appendix, and Statement of Material Facts.  (See Dkt. Entries 182, 184, 185 and 194.)  Plaintiff then filed a motion for a continuance pursuant to Fed. R. Civ. P. 56(f) which was granted.  A contentious period of discovery then ensued.  On April 17, 2006, Fortune filed a Brief in Opposition to Defendants' motion, a statement of disputed facts, and appendix.  (See Dkt. Entries 305 - 307.)  Defendants filed a Reply Brief and Appendix on May 8, 2006.  (Dkt. Entries 309 and 312.)  Fortune has filed a motion to strike Defendants' Reply Brief (Dkt. Entry 314), accusing them of challenging his exhaustion efforts as to the July 2000 use of force

-2-

incident for the first time in their reply materials.  In opposition to this motion, Defendants note

they raised the affirmative defense of failure to exhaust administrative remedies as to his claims

against Bell and Bitner as well as both use of force events.  Fortune did not file a reply brief.

These motions are presently ripe for decision.

For the following reasons, Defendants' Motion for Summary Judgment will be

granted and Fortune's Motion to Strike will be denied.

## II.   Undisputed Facts as Established by the Record

### A.    Request for Emergency Transfer out of SCI-Huntingdon.

Fortune was transferred out of SCI-Huntingdon in 1993, only to return in 1996

after being involved in a fight with a fellow prisoner at another facility.  (Dkt. Entry 185-2, Appx.

in Support of Defendants' Motion for Summary Judgment, Exh. 1, Portions of Fortune's

Deposition, p. 5.)   Upon his return, Plaintiff was fearful of unidentified SCI-Huntingdon staff

members after reading a series of Philadelphia newspaper articles reporting the discovery and

exhumation of several inmate bodies on institutional grounds.  (Id.)  Although fearful of SCI-

Huntingdon staff members in general, Fortune could not specifically identify any staff members

who made him feel as if they were going to murder him.  (Id. at pp. 5-6.)

Upon his return to SCI-Huntingdon on December 29, 1996, Plaintiff was placed in

Administrative Custody ("AC"), and held there until February 1997, when he was released into

the institution's general population.  (Dkt. Entry 305, Plaintiff's Disputed Statement of Material

Facts ("PSMF") at ¶ 10.)  On March 5, 1998, Fortune was placed in the RHU, under

Disciplinary Custody ("DC"), after receiving several misconducts resulting in DC time extending

until September 30, 1998.  (Dkt. Entry 307, Fortune's Appx. in Opposition to Summary

Judgment, p. 21.)

                On May 15, 1998, Fortune wrote to former Secretary Martin Horn requesting an

emergency transfer from SCI-Huntingdon based on his fears that staff had tried to kill him on

March 6, 1998.[2]   (Dkt. Entry 185-2, Appx. in Support of Defendants' Motion for Summary

Judgment, Exh. 1, Portions of Fortune's Deposition, p.7; see also Id., Exh. 2, Deposition

Exhibits, p. 18.)  Defendant Bell, a member of the Bureau of Inmate Services, was designated

to respond to Fortune's letter and did so on May 29, 1998, advising him that all transfer

requests must originate at the institutional level.  (Id. at p. 19.)  In June 1998, Fortune wrote

directly to Bell complaining that SCI-Huntingdon staff would not consider his transfer request

because it involved staff from that facility.  (Dkt. Entry 185-2, Appx. in Support of Defendants'

Motion for Summary Judgment, Exh. 2, Deposition Documents, Fortune Exh. 2, p. 20.)  He

requested Bell review the video tape of the incident to confirm his claims of staff malfeasance.

(Id.)  On July 14, 1998, Bell sent Fortune a letter identical to his earlier correspondence.  (Id.,

---

      [2]   I take judicial notice of the docket in Fortune v. Horn, 3:98-CV-01724 (M.D.
Pa.)(Conaboy, J.), the civil rights action filed by Plaintiff relative to assault claim arising out of a
March 6, 1998, incident.  After a jury trial, judgment was entered in favor of the corrections
defendants.  The decision was affirmed on appeal.

Exh. 2, Deposition Documents, Fortune Exh. 3, p. 21.)  Bell's only other involvement with

Fortune was in response to grievance appeals filed to final review while Plaintiff was housed at

SCI-Greene.[3]  Those grievances dealt exclusively with issues and events arising at SCI-

Greene.  (Id., p. 9; see also, Exh. 5, Bell Decl. at ¶ 8.)  At all times relevant to this action, Bell

had no authority over inmate separations or transfer matters.  (Dkt. Entry 182, DSMF at ¶ 8.)

Robert Bitner is the DOC's Chief Hearing Examiner responsible for reviewing and

deciding inmate appeals related to their placement in a DOC level 5 housing unit, like an RHU,

for either administrative custody or disciplinary custody reasons.   His role is limited to providing

the final level of review of the inmate's first and second level institutional appeals of their

custody designation as set forth in DC-ADM 801, Inmate Discipline Policy, and DC-ADM 802,

Administrative Custody Procedures.  (Dkt. Entry 182, DSMF at ¶ 14; Dkt. Entry 312, Appx. to

Defendants' Reply Brief, Bitner Decl. at ¶ 2; see also http:/www.cor.state.pa.us, DOC Policies,

DC-ADM 801 and DC-ADM 802.)

Initially, an inmate may be placed in AC at his request, or by security staff, with

final approval being required by the Program Review Committee ("PRC") .  (See DC-ADM 802.)

On September 28, 1998, at the expiration of Fortune's DC time, he remained in the RHU, but

---

[3]  Between 1992 and October 24, 1997, Bell was one of a three member panel of the DOC's, now defunct, Central Office Review Committee ("CORC"), which handled appeals of inmate misconducts.  (Dkt. Entry 182, Defendants' Statement of Material Facts Not in Dispute ("DSMF") at ¶ 8).

placed in AC status due to his "pattern of extremely aggressive and unpredictable behavior"

pending a transfer to SCI-Waymart's RHU program for inmates with mental health problems.

(Dkt. Entry 185-2, Appx. in Support of Defendants' Motion for Summary Judgment, Exh. 6,

Bitner Decl., Exh. A, Other Report No. 528542, p. 69.)  Fortune appealed the PRC's decision to

SCI-Huntingdon's Superintendent who denied the appeal.  Dissatisfied with the

Superintendent's response, he appealed to the Chief Hearing Examiner, Robert Bitner, who

concurred with the institution's decision to place him in AC. (Id. at pp. 70 - 74; see also Dkt.

Entry 182, DSMF at ¶ 17.)

On November 25, 1998, Fortune received "Other Report" No. 165605, which

returned him to AC status at the conclusion of a stint of DC time.  The report noted that "there

are circumstances that may preclude Fortune's placement in our general population,

specifically, there are mental health concerns and inmate Fortune is being considered for the

special assessment unit at SCI-Waymart."  (Dkt. Entry 185-2, Defendants' Appx. in Support of

Motion for Summary Judgment, Exh. 6, Bitner Decl., Exh. C, p. 82.)  At the PRC hearing,

Fortune opposed his AC placement and submitted an inmate version, which he also read aloud

to the PRC.  (Id.)   After Superintendent Frank denied Fortune's appeal of the PRC's decision,

Fortune pursued his appeal to final review, specifically taking issue with the "PRC finding

labeling [him] as mentally ill and its proposal to commit [him] to a mental health program."  (Id.

at pp. 82 - 86.)  On March 4, 1999, Bitner denied the appeal, finding that Fortune's "placement

in Administrative Custody was in complete accordance with the provisions outlined under DC-ADM 802."  (Id. at p. 87; Dkt. Entry 182, DSMF at ¶¶ 19-20.)

In February 1999, SCI-Huntingdon's PRC reviewed Fortune's counselor's recommendation for transfer and approved it.  (Dkt. Entry 307, Fortune's Appx. in Opposition to Summary Judgment, Exh. D2, PRC Periodic Review of 2/11/99, p. 22.)  In March 1999, Fortune, concerned for his safety after being removed from the Mental Health Roster, wrote to Superintendent Frank requesting an emergency transfer.  Plaintiff claimed not to have raised the issue of his personal safety with the Superintendent earlier because he was fearful he would be committed to a Mental Health Unit.  (Id., Exh. D3, p. 23.)  Fortune was advised that his personal security concerns were previously addressed and determined to be unfounded. Fortune was also told that facility staff did submit a transfer request on his behalf to Central Office, but the request was denied.  (Id., Exh. D4, p. 24.)

On July 19, 1999, Other Report 165609 was issued to Fortune, placing him on AC status at the conclusion of his disciplinary custody time due to his "unpredictable and highly problematic" behavior.  In opposing the PRC's AC placement, Fortune wrote "a transfer would be in [his] best interest" because, despite his best efforts "to do what is right," staff continue to provoke him into situations which allow them to make veiled attempts on his life.  He appealed the PRC's determination to the Superintendent on the basis that his written statement requesting a transfer was not considered by the committee.  Superintendent Frank, noting that

-7-

he had read Fortune's written statement, upheld the PRC's decision based on Fortune's behavior.  Fortune appealed the PRC's decision to final review, again asserting that the PRC had not considered his written statement.  Defendant Bitner denied the appeal, noting that Fortune's placement was in accordance with the provisions of DC-ADM 802, the <u>Administrative Custody Procedures</u>.  (Dkt. Entry 185-2, Appx. in Support of Defendants' Motion for Summary Judgment, Exh. 6, Bitner Decl., Exh. B, pp. 75 - 81; Dkt. Entry 182, DSMF at ¶ 18.)

At no time did Fortune file a grievance via the DOC's <u>Inmate Grievance System</u>, DC-ADM 804, against either Defendants Bitner or Bell.  (Dkt. Entry 182, DSMF at ¶ 5; Dkt. Entry 305, PSMF at ¶ 5.)  He raised no claim administratively that implicated Bitner or Bell in connection with a claim that they frustrated his attempts to obtain a transfer in deliberate indifference to a substantial risk of serious harm.

**B.     December 28, 1999, Use of Force Event.**

On December 28, 1999, while single-celled in SCI-Huntingdon's RHU, Lt. Couch gave Fortune repeated orders to come to his cell door to be handcuffed, so security officers could remove him from the cell and perform a security check of his cell.  (Dkt. Entry 185-2, Appx. in Support of Defendants' Motion for Summary Judgment, Exh. 1, Portions of Fortune's Deposition, p. 13.)  When Fortune failed to comply with these orders, an extraction team entered his cell, handcuffed him behind his back, tore his jump suit and undergarments from his body, and strip searched him.  Shackles were also placed on Plaintiff's legs.  Officers carried

Fortune naked from his cell to the end of his tier, where he was temporarily placed in a dry shower stall.  Fortune stood in the shower with his back against the door for several minutes. After corrections staff searched his cell, Fortune was permitted to walk, with an escort, back to his cell, where his restraints were removed.  The entire event was videotaped.  (See Dkt. Entry 195, Videotape of December 28, 1999, cell extraction.)

While in the shower stall, Nurse Williams, who was with the extraction team that day, asked Fortune if he "had injuries you need to see medical about."  When Fortune failed to respond, Williams identified himself as a nurse and again asked Fortune if he wished to speak with Williams.  Fortune responded that he had several injuries, and RN Williams commenced interviewing Fortune and physically examining him through the bars of the shower stall door. Although finding that Fortune did not need immediate care for his complaints, Nurse Williams requested the videographer to film Fortune's right shoulder and wrists for the "record."  Nurse Williams encouraged Fortune to use warm compresses on his shoulder and to contact medical if needed.  Nurse Williams' examination of Fortune was also videotaped.  (Id.; see also Dkt. Entry 185-2, Appx. in Support of Defendants' Motion for Summary Judgment, Exh. 1, Portions of Fortune's Deposition, p. 16.)

As a result of this event, Fortune received a misconduct for refusing to obey an order to come to his door to be handcuffed for the purpose of a security check of his cell.  (Dkt. Entry 312, Defendants' Appx. in Support of their Reply Brief, Bitner Decl., Exh. A, Misconduct

-9-

Report A254712.)  After a misconduct hearing, Fortune was found guilty by a hearing examiner and given the sanction of 60 additional days DC time.  (Id., Bitner Decl., Exh. A, Disciplinary Hearing Report for Misconduct Report A254712.)  Following the DOC's Inmate Discipline Policy, DC-ADM 801, Fortune appealed his misconduct on the sole basis that "the punishment [was] disproportionate to the offense."  (Id., Misconduct Hearing Appeal.)

       While housed in the RHU, Fortune filed three grievances related to the events of December 28, 1999.  The first grievance, dated January 10, 1999, alleges that Nurse Williams denied him adequate medical care after the cell extraction.  It  was returned to Fortune, unprocessed, due to his failure to comply with the requirements of DC-ADM 804.  (See Dkt. Entry 185-3, Appx. in Support of Defendants' Motion for Summary Judgment, Exh. 8, Baney Decl., Exh. C, pp. 9 - 11.)  The second grievance was filed on January 21, 2000, and repeats the allegations made in his first rejected grievance against Nurse Williams.  Plaintiff claims that after the cell extraction he "reported the fact that [he] was injured to [Nurse Williams], who told [him] to sign up for sick call and walked away."   (Dkt. Entry 185-2, Appx. in Support of Defendants' Motion for Summary Judgment, Exh. 1, Portions of Fortune's Deposition, Exh. 8, Baney Decl., Exh. A, Grievance No. 0020-00, p. 96.)  He also accuses the nurse of failing "to document, or photograph the injuries for the incident report."  (Id.)  Fortune received an initial response on February 8, 2000.   On March 6, 2000, Superintendent Kyler denied his appeal.  (Id. at pp. 97 - 100.)  Twelve days later, on March 18, 2000, Fortune appealed the grievance to

-10-

final review.  (Dkt. Entry 185-3, Appx. in Support of Defendants' Motion for Summary Judgment,  Exh. 8, Baney Decl., Exh. A, p. 1.)  Citing Fortune's failure to comply with the procedures set forth in DC-ADM 804, Bitner dismissed the appeal as untimely. (Id. at p. 2.)  In the third and final grievance, No. 0021-00, Fortune claims his personal property was improperly confiscated during the cell search.  (Id. at Exh. B, Grievance No. 0021-00, pp. 3-8.)

### C.   July 24, 2000, Excessive Use of Force Incident.

On July 24, 2000, Fortune received misconduct number A334755 for using abusive, obscene or inappropriate language to an employee and refusing to obey an order. (Dkt. Entry 185-2, Appx. in Support of Defendants' Motion for Summary Judgment, Exh. 1, Portions of Fortune's Deposition, p. 17; Dkt. Entry 312, Appx. to Defendants' Reply Brief, Bitner Decl., Exh. B, Misconduct Report No. A334755.)  Fortune was found guilty of both charges and given 60 days of additional disciplinary custody as a sanction.  (Dkt. Entry 312, Appx. to Defendants' Reply Brief, Bitner Decl., Exh. B, p. 17.)  Fortune appealed the misconduct to the PRC.  The PRC sustained the Hearing Examiner's decision. (Id. at pp. 18-19.)  Fortune then filed an appeal with Chief Hearing Examiner Bitner, who rejected the appeal due to Fortune's failure to comply with the procedural requirements of DC-ADM 801.  (Id. at 20.)

Plaintiff was on grievance restrictions on July 24, 2000, which precluded him from filing more than two (2) grievances a month.  (Dkt. Entry 185, Appx. in Support of Defendants' Motion for Summary Judgment,  Exh. 1, Portions of Fortune's Deposition, p. 17; see also DC-

ADM 804, Definitions.)  In August 2000, Fortune was filing grievances related to matters

occurring during July of 2000.  Fortune, however, did not file, or even attempt to file, a

grievance alleging that excessive force was used against him on July 24, 2000.  (Dkt. Entry

185-2, Appx. in Support of Defendants' Motion for Summary Judgment,  Exh. 8, Second Baney

Decl. at ¶ 7; Dkt. Entry 182, DSMF at ¶ 5; PSMF at ¶ 7; Dkt. Entry 185, Exh. 1, Portions of

Plaintiff's Deposition, p. 17.)

## III.    Standard of Review

Summary judgment should be granted when "the pleadings, depositions, answers

to interrogatories, admissions on file, together with affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed.R.Civ.P. 56(c).  "The mere existence of some alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no genuine issue of material fact."  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  Only disputes over facts that might affect the

outcome of the suit will preclude the entry of summary judgment.  The substantive law

determines which facts are material.  Id. at 248.  A dispute is genuine if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party.  Id. at 250.  If the court

determines that "the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party, there is no 'genuine issue for trial'."  Matsushita Elec. Industrial Co. v. Zenith

-12-

Radio, 475 U.S. 574, 587 (1986) (citing First Nat. Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 289 (1968)).  All inferences, however, "'should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true'." Pastore v. Bell Tel. Co. of Pennsylvania, 24 F.3d 508, 512 (3d Cir.1994) (citing Big Apple BMW, Inc. v. BMW of N. America, Inc., 974 F.2d 1358, 1363 (3d Cir.1992); Wicker v. Consol. Rail Corp., 142 F.3d 690, 696 (3d Cir.1998).

  The moving party bears the initial responsibility of stating the basis for its motion, identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  As a general rule, unsubstantiated arguments made in briefs are not considered evidence of asserted facts. Versarge v. Township of Clinton, 984 F.2d 1359, 1370 (3d Cir.1993).  The moving party must present competent evidence to support his version of events.  Likewise, the nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir.1989)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986)).  The nonmoving party cannot "simply reassert factually unsupported allegations contained in [the] pleadings." Williams, 891 F.2d at 460 (citing Celotex, 477 U.S. at 325).  "Once the moving party has carried the initial burden of showing that no genuine issue of material fact exists, the nonmoving party ... 'must make a showing sufficient to establish the existence of every element essential to his case,

based on the affidavits or by the depositions and admissions on file'." Pastore, 24 F.3d at 511

(citing Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992)).  If the evidence in favor of the

nonmoving party is merely colorable or not significantly probative, summary judgment should

be granted.  Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir.1998) (citing Matsushita

Elec. Indus., Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

IV.    **Discussion**

        A.    **Exhaustion of Administrative Remedies**

        Under the Prison Litigation Reform Act ("PLRA"), exhaustion of administrative

remedies is required for all actions concerning prison conditions brought under federal law.

See 42 U.S.C. § 1997e(a); Woodford v. Ngo, 126 S. Ct. 2378 (2006).  The "exhaustion

requirement applies to all inmate suits about prison life, whether they involve general

circumstances or particular episodes, and whether they allege excessive force or some other

wrong."  Porter v. Nussle, 534 U.S. 516 (2002).  "The PLRA attempts to eliminate unwarranted

federal-court interference with the administration of prisons, and thus seeks to afford

corrections officials time and opportunity to address complaints internally before allowing the

initiation of a federal case."  Woodford, 126 S. Ct. at 2387 (internal quotation and citation

omitted).  "The benefits of exhaustion can be realized only if the prison grievance system is

given a fair opportunity to consider the grievance."  Id. at 2388.

        The PLRA mandates that inmates "properly" exhaust administrative remedies

before filing suit in federal court.  Id. at 2387.  "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings."  Id. at 2386.  Failure to substantially comply with procedural requirements of the applicable prison's grievance system will result in a procedural default of the claim.  Spruill v. Gillis, 372 F.3d 218, 227-32 (3d Cir. 2004).   The PLRA "completely precludes a futility exception to its mandatory exhaustion requirement."  Nyhuis v. Reno, 204 F.3d 65, 71 (3d Cir. 2000).

A prisoner does not have to allege in his complaint that he has exhausted administrative remedies.  Ray v. Kertes, 285 F.3d 287 (3d Cir.2002).  Failure to exhaust available administrative remedies is an affirmative defense.  (Id.)  As such, it must be pleaded and proven by the Defendants.  Brown v. Croak, 312 F.3d 109, 111 (3d Cir. 2002).

### B.    Available Administrative Remedy Processes

The Pennsylvania Department of Corrections ("DOC") has three different grievance or administrative remedy processes which collectively provide an inmate a forum to challenge every aspect of confinement.  Those policies are: (1) the Inmate Grievance Policy, DC-ADM 804; (2) the Inmate Discipline Policy; DC-ADM 801; and (3) the Administrative Custody policy, DC-ADM 802.  (See http://www.cor.state.pa.us, DOC Policies, DC-ADM 801; DC-ADM 802; and DC-ADM 804.)   The three programs are each designed to address specific issues which may arise within the prison.  One administrative remedy may not be substituted

for another.  Each policy clearly spells out any mandates, or exceptions, with respect to issues that must be addressed , or conversely, excluded from consideration, under the policy. (See DC-ADM 804, Section VI, Procedures, F.  Exceptions; DC-ADM 802 and DC-ADM 801.) Inmates challenging their initial or continued confinement in any one of the DOC's level 5 housing units (i.e., Restricted Housing Unit, Special Management Unit, or Long Term Segregation Unit) are required to challenge their placement through either DC-ADM 801 or DC-ADM 802 depending upon whether their placement is AC or DC related.  Inmates are not permitted to challenge their AC or DC placement via DC-ADM 804, the Inmate Grievance Policy.  The prohibition of challenging their AC or DC status via DC-ADM 804 derives from the fact that the level 5 housing units are the most secure and controlled areas within the institution, designed to house inmates posing problematic safety and security concerns and requiring their segregation from general population.  Decisions related to the management of these units is primarily committed to the PRC, which consists of the prison officials most familiar with these inmate and the unit.

In Pennsylvania, an RHU inmate's challenge to his initial or continued confinement in AC is only properly exhausted for PLRA purposes when the inmate complies with the administrative remedy process set forth in DC-ADM 802 rather than DC-ADM 804. See Boyd v. Department of Corrections, 32 Fed. Appx. 16, 17 - 18 (3d Cir. 2002).  RHU inmates, however, are not precluded from filing grievances pursuant to DC-ADM 804, related to

issues impacting their quality of life, other than the reasons for the RHU confinement.  (Id.)(AC

inmate who wishes to pursue claims related to an assault, denial of medical care, retaliation,

denial of exercise opportunities or access to legal materials must first exhaust his available

administrative remedies via DC-ADM 804.)

### C.   The Eighth Amendment Failure to Protect Claim against Bell and Bitner.

Fortune asserts that Bell and Bitner, through his varied correspondence with

them, were on notice of his claims that SCI-Huntingdon staff sought to harm him and failed to

investigate his allegations or transfer him from SCI-Huntingdon.  (Dkt. Entry 124, Third

Amended Complaint.)  Defendants claim that Bell and Bitner are entitled to summary judgment

as Fortune failed to exhaust his available administrative remedies related to his Eighth

Amendment failure to protect claim against them prior to bringing this claim in federal court.

It is undisputed that Fortune never filed a grievance pursuant to the DOC's

grievance system ("DC-ADM 804") against Bell or Bitner.  (See Dkt. Entry 182, DSMF at ¶ 5

and Dkt. Entry 305, PSMR at ¶ 5).  Fortune argues that the DOC's grievance system was

unavailable to him for the purpose of pursuing a grievance related to "classification, separation,

and transfer requests" as they "are encompassed under DC-ADM 802,"  and are not grievable

via DC-ADM 804.  To support this assertion, he claims that "DC-ADM 802 is specifically used to

transfer a[n] inmate where there is a security risk or threat to his safety."  (Dkt. Entry 306,

Fortune's Brief in Opposition to Summary Judgment; and Dkt. Entry 307, Fortune's Appx. in

Opposition to Summary Judgment, Plaintiff's Declaration at ¶ 28, p. 6.)

Defendants disagree with Fortune's interpretation of DC-ADM 802 and further assert that it does not apply to the denial of <u>his</u> request for an emergency transfer.  Clearly, when corresponding with Bell, Fortune was not in AC, nor was he requesting placement in AC, but rather was seeking a transfer out of SCI-Huntingdon.   Likewise, I do not find any restrictive language within DC-ADM 804, or mandatory inclusive language within DC-ADM 802, requiring RHU inmates to challenge the denial of their transfer request via DC-ADM 802 rather than DC-ADM 804.   For PLRA purposes, Fortune was required to pursue a grievance against Bell for denying his request for an emergency transfer via DC-ADM 804 prior to filing this action.  <u>See</u> <u>Boyd</u>, <u>supra</u>.  Fortune failed to do so, and his Eighth Amendment failure to protect claim against Bell is thus barred.

As to his claim against Bitner, Plaintiff argues that since he raised the issue of his transfer request within his DC-ADM 802 appeals, appeals which Bitner reviewed, his failure to protect claim against Bitner is exhausted.  While Defendants concede that Fortune exhausted his available administrative remedies with respect to his challenge to his initial and continued AC confinement, and that Bitner provided the final review in that process, they do not agree that Plaintiff's appeal of his "Other Reports" encompass the same claim he presents in his Third Amended Complaint in this protracted litigation.

Fortune's DC-ADM 802 appeal challenged his placement, and continued

-18-

confinement, in administrative custody.  Fortune's claim against Bitner is that he was deliberately indifferent to Plaintiff's security concerns.  (Dkt. Entry 306, Fortune's Opposition to Summary Judgment.)  None of the appealed "other" or "misconduct" reports in the record, however, place Bitner on notice of Fortune's claim of failure to investigate staff abuses and/or failure to transfer him out of SCI-Huntingdon.  These appeals focus on either his AC placement or receipt of a misconduct, issues with which Bitner had no personal involvement.

The PLRA's exhaustion requirement was designed to reduce the quantity and improve the quality of prisoner lawsuits, as well as afford corrections officials an opportunity to address complaints internally before allowing the initiation of a federal suit.  Woodford, 126 S. Ct. at 2387-88 ("The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance.") The PLRA exhaustion requirement is satisfied if the Plaintiff files a grievance and appeals the denial of the grievance to the highest level possible, giving the prison "fair notice" of the claim and an opportunity to remedy it.  To provide fair notice of a claim, the plaintiff must allege specific acts of mistreatment or misconduct and identify the responsible party or parties.  See Pack v. Martin, 174 Fed. Appx. 256 (6th Cir 2006); Johnson v. Johnson, 385 F.3d 503, 516 (5th Cir.2004); Burton v. Jones, 321 F.3d 569, 575 (6th Cir. 2003).  Although neither the Third Circuit Court of Appeals nor the Supreme Court  has defined how specific an inmate's administrative grievance must be to place the prison on "fair notice" of a claim prior to pursuing it in federal court, the Supreme Court has

held that the prisoner's compliance with the agency's applicable administrative remedy process should be the yardstick for making such an assessment.  Woodford, 126 S. Ct. at 2386; Spruill, 372 F.3d at 227-32.

It is clear that Fortune's appeals of his "Other Reports" and his misconducts to final review by Bitner were insufficient to place corrections officials on notice that Fortune sought to hold Bitner accountable for failing to protect him from harm.  Bitner played no personal role in Fortune's placement in AC, nor his receipt of misconducts.  Fortune's failure to identify Bitner, or the claim he seeks to pursue against this defendant, in any grievance within the context of DC-ADM 804 precludes consideration of the merits of such a claim.  Woodford, supra; Boyd, supra.  His claim against Bitner is unexhausted, and must be dismissed.

### D.      The December 28, 1999, Use of Force Event.

Defendants claim they are entitled to summary judgment in their favor based on Fortune's failure to exhaust administrative remedies with respect to his use of force allegations arising from the December 28, 1999 cell extraction.  The summary judgment record reflects that Fortune received misconduct number A254712 after he failed to heed repeated orders to come to his cell door to be handcuffed so the officers could perform a security check of his cell.  (Dkt. Entry 185-2, Appx. in Support of Defendants' Motion for Summary Judgment, Exh. 1, Portions of Fortune's Deposition, Fortune Exh. 6, p. 37.)  Fortune was found guilty of the misconduct

and given 60 days disciplinary custody as a sanction.  (Id.)  Fortune, utilizing his administrative

remedies as provided by DC-ADM 801, the Inmate Discipline Policy, appealed this matter

solely based on the grounds that "the punishment [was] disproportionate to the offense."  (Id. at

p. 39.)  The Superintendent, as well as Chief Hearing Examiner Bitner, denied Plaintiff's

appeals.  (Dkt. Entry 312, Appx. to Defendants' Reply Brief in Support of Motion for Summary

Judgment, pp. 12-13.)  Fortune does not dispute these facts.

Likewise, Plaintiff does not dispute that he filed three separate grievances via

DC-ADM 804, the Inmate Grievance System, related to the December 1999 event.  (See Dkt.

Entry 185-2 & 185-3, Appx. in Support of Defendants' Motion for Summary Judgment, Exh. 8,

Second Baney Decl., Exh. A - C.)  These grievances addressed the alleged denial of medical

care and the confiscation of personal property.  Notably, none of them allege that Defendants

used excessive force against Fortune on that day.  Accordingly, Defendants are entitled to

summary judgment as to Fortune's claim of excessive use of force related to the December 28,

1999, cell extraction due to his failure to comply with the PARA's exhaustion requirement.

### E.    Plaintiff's Motion to Strike Defendants' Reply Brief

Plaintiff has moved to strike Defendants' Reply Brief, asserting that "nothing in

the [Defendants'] Brief or Statement of Material Facts indicated there was no genuine issue

with regard to the exhaustion under DC-ADM 801 with regards to the incident occurring on July

24, 2000."  (Dkt. Entry 318, Brief in Support of Motion To Strike.)  He further claims that the

-21-

argument and documents offered by Defendants' in their Reply Brief concerning exhaustion of administrative remedies relative to misconduct number A334755 are incomplete and misleading.  (Id.)

The fact that Fortune may or may not have successfully exhausted his administrative remedies via DC-ADM 801 with respect to the misconduct he received on that day bears no relation to the question of whether he pursued an administrative complaint that SC.-Huntingdon officers assaulted him on that date.  Fortune's motion to strike Defendants' Reply Brief will be denied as Defendants raised the exhaustion issue with respect to the use of force claim related to the July 24, 2000 event in their initial summary judgment materials.  (See Dkt. Entry 184, Defendants' Brief in Support of Motion for Summary Judgment, p. 7)("Further, the Plaintiff failed to file any grievance regarding the July 24, 2000 incident.")

F.    **The July 24, 2000, Use of Force Event.**

The July 24, 2000, use of force event involved defendants Parks, Stevens, Mellott, Smith and Snyder.  (Dkt. Entry 182, DSMF at ¶ 29.)  Defendants assert they are entitled to summary judgment on this issue since Fortune failed to exhaust administrative remedies as to this claim.  Fortune admits that he never filed a grievance against these defendants for their alleged use of excessive force against him on this date. (Dkt. Entry 185-2, Appx. in Support of Defendants' Motion for Summary Judgment, Exh. 1, Portions of Fortune's Deposition, p. 17.)  Fortune asserts that he was unable to do so as he was on grievance

restriction at the time and only permitted to file two grievances per month.  (Id.)  In his

deposition, Plaintiff admits that even after he was taken off grievance restrictions he did not

attempt to file a grievance regarding this claim at any time, observing that "you only get 15

days" from the date of the event to file a grievance on the matter.

           Fortune admits, however, that he has submitted grievances beyond the filing time

limit.[4]  Fortune was clearly aware of the administrative remedy process, and had the

opportunity to file grievances related to events that occurred in the prior month even though he

was on grievance restrictions.[5]  It is undisputed that Fortune never filed a grievance related to

his July 2000 use of force claims.  Fortune does not claim that he tried to file a grievance only

to have it rejected as untimely by prison officials, or that Defendants somehow prevented him

from filing a grievance on the issue.  Fortune's excessive use of force claims arising from the

July 2000 event were procedurally defaulted without excuse.  Fortune could have filed a

_____

[4]  On January 21, 2000, Fortune filed Grievance No. 0020-00, claiming that RN Williams denied him adequate medical care after the December 28, 1999, cell extraction.  This grievance, although filed more than 15 days after the event giving rise to the claim, was addressed on the merits by the DOC.  (See Dkt. Entry 185-2, Appx. in Support of Defendants' Motion for Summary Judgment, Exh. 8, Second Baney Decl., Exh. A, Grievance No. 0020-00.)

[5]      Q:  So you got injured in July 2000 and so you used up your two
       [grievances] for that month.  Did you file any in August?

       A:  No, because I was still trying to file ones from July....

(See Dkt. Entry 185-2, Appx. in Support of Defendants' Motion for Summary Judgment, Exh. 1, Portions of Fortune's Deposition,  p. 17.)

grievance after the expiration of the filing period and requested that it be considered due to the two-grievances per month limitation.  His failure to invoke the administrative remedy process is fatal to this claim.

G.    **Fortune's Eighth Amendment Claim Against RN Williams**

The Eighth Amendment "requires prison officials to provide basic medical treatment to those [ ] incarcerated."  Rouse v. Pannier, 182 F.3d 192, 197 (3d Cir. 1999)(citing Estelle v. Gamble, 429 U.S. 97 (1976)).  To establish a medical claim based on the Eighth Amendment, an inmate must allege acts or omissions by prison officials sufficiently harmful to evidence deliberate indifference to a serious medical need.  See Spruill v. Gillis, 372 F.3d at 235 -36 (3d Cir. 2004).  Without the requisite mental state, a prison official's conduct alone will not constitute deliberate indifference.  See Farmer v. Brennan, 511 U.S. 825, 837-38 (1994). Negligence, unsuccessful medical treatment, and medical malpractice do not give rise to a successful claim, and an inmate's disagreement with medical treatment is insufficient to establish deliberate indifference.  See Dormer v. O'Carroll, 991 F.2d 64, 68-69 (3d Cir. 1992). "[A]s long as a [medical professional] exercises professional judgment his behavior will not violate a prisoner's constitutional rights."  Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990).

In this case, Fortune claims his lower back, right shoulder, right wrist, and left thumb were injured during his cell extraction, and that RN Williams failed to provide him with

adequate treatment or pain medication after the event.  (Dkt. Entry 124, Third Amended

Complaint, ¶ 46.)  A review of the videotape of the cell extraction reveals that RN Williams and

Fortune were engaged in a question and answer dialogue about Plaintiff's injuries after Fortune

was placed in the shower stall.  (See Dkt. Entry 195, Videotape of December 28, 1999, cell

extraction.)  RN Williams physically examined Fortune, and based on Fortune's subjective

complaints, requested the videographer to film for "the record" specific areas on Plaintiff's body

that he claimed were injured.  (Id.)  Nurse Williams completed a Medical Incident/Injury Report

in which he indicated that no swelling, discoloration, or decreased range of motion of Fortune's

right shoulder, wrists, or left thumb were evident.  (Dkt. Entry 194, Declaration of William

Williams, Exh. A.)   Although dissatisfied with RN Williams' assessment and treatment of his

claimed injuries, Fortune does not dispute that Nurse Williams examined him and exercised his

professional judgment as to his injuries.  Fortune's allegations against Nurse Williams do not

rise to the level of an Eighth Amendment claim.  "[W]here a prisoner has received some

medical attention and the dispute is over the adequacy of the treatment, the federal courts are

generally reluctant to second guess medical judgment and to constitutionalize claims which

sound in state tort law."  Flanyak v. Hopta, 410 F. Supp.2d 394, 403 (M.D. Pa. 2006).  Based

on the record, Nurse Williams is entitled to summary judgment.

**V.**          **Conclusion**

_____For the reasons set forth above, Plaintiff's Motion to Strike Defendants' Reply

Brief will be denied.  Defendants' motion for summary judgment based on Fortune's failure to exhaust  available administrative remedies related to his failure to protect claim against Bell and Bitner, and his two excessive use of force claims against the various SCI-Huntingdon defendants, will be granted.[6]  As to Plaintiff's claims that RN Williams was deliberately indifferent to his alleged serious medical injuries, the record taken as a whole would not lead a rational trier of fact to find for Fortune on this matter.  RN Williams is also entitled to summary judgment.  An appropriate Order follows.

**s/ Thomas I. Vanaskie**
Thomas I. Vanaskie
United States District Judge

---

[6] Since the exhaustion of administrative remedies is a threshold issue, there is no need to consider Defendants' alternative argument that the Fortune cannot meet his burden of proof with respect to these Eighth Amendment claims.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **KENNETH FORTUNE,** | : |
| | : |
| **Plaintiff** | : |
| | :   **CIVIL NO. 3:CV-01-0111** |
| **vs.** | : |
| | :   **(CHIEF JUDGE VANASKIE)** |
| **ROBERT S. BITNER, et al.,** | : |
| | : |
| **Defendants** | : |

**O R D E R**

**NOW**, this **25th day of SEPTEMBER**, **2006**, for the reasons set forth in the foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

1.  Defendants Second Motion for Summary Judgment (Dkt. Entry 181) is **GRANTED**.

2.  Plaintiff's Motion to Strike (Dkt. Entry 314) is **DENIED**.

3.  The Clerk of Court is directed to enter judgment in favor of all Defendants and to mark this matter **CLOSED.**

**s/ Thomas I. Vanaskie**
Thomas I. Vanaskie
United States District Judge